IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


CHRISTINA A. WORKMAN,                                  Case No. 6:16-cv-01507-SB

     Plaintiff,                                        **OPINION AND ORDER**

     v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

     Defendant.

_____

**BECKERMAN, Magistrate Judge.**

     Christina Workman ("Workman") brings this appeal challenging the Commissioner of

Social Security's ("Commissioner") denial of her applications for Child's Insurance Benefits

("CIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401-34, 1381-83f. The Court has jurisdiction to hear this appeal

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons that follow, the Court affirms

the Commissioner's decision because it is free of harmful legal error and supported by

substantial evidence.

**BACKGROUND**

Workman was born in September 1992. She lives with her husband and two young children, and has a high school diploma, a history of attending college classes, and no past work experience. Workman alleges disability as of her date of birth due primarily to Asperger's Syndrome, absence seizures, depression, and anxiety.

In April and May 2008, Workman's high school reviewed her eligibility for special education services. (Tr. 445-53.) As part of this process, the high school measured Workman's general intellectual functioning level using the Wechsler Intelligence Scale for Children, Fourth Edition ("WISC-IV"). On the WISC-IV, Workman's overall ability for learning was in the "average range at the 55th percentile," her verbal comprehension was in the "average range at the 55th percentile," her perceptual reasoning was in the "average range at the 39th percentile," her working memory was in the "high average range at the 81st percentile," and her processing speed was in the "average [range] at the 27th percentile." (Tr. 449.) Workman also obtained a full-scale intelligent quotient ("IQ") score of 102 on the WISC-IV,[1] and scored in the "96th percentile" on the Bender-Gestalt II.[2] (Tr. 299, 453.) On the Woodcock-Johnson Tests of Achievement, Third Edition ("WJ-III"), however, Workman's reading comprehension level was "significantly below her cognitive ability" and she exhibited "some significant articulation problems" due to a speech impediment. (Tr. 450-51.) Accordingly, school officials, who initially considered discharging Workman from special education services, concluded that Workman

---

[1] A full-scale IQ of 102 suggests that Workman is "generally functioning in the average range." *See Halbrook v. Chater*, 925 F. Supp. 563, 565 (N.D. Ill. 1996) (stating that the claimant had "a full-scale IQ of 105, which indicates that he is generally functioning in the average range").

[2] The Bender-Gestalt II is "a test designed primarily to screen for developmental disorders or assess neurological function or brain damage." *Scott v. Comm'r Soc. Sec.*, No. 10-0061, 2011 WL 720198, at *4 (N.D. Ohio Jan. 25, 2011).

continued to be eligible for special education services based on an Autism Spectrum Disorder. (Tr. 446-48.)

On March 14, 2011, Workman received the following results on the WJ-III: "[O]ral language skills are average when compared to the range of scores obtained by others at her age level; oral expression skills are low average; . . . listening comprehension skills are average; . . . ability to apply academic skills is average; . . . high average in written expression and average in basic reading skills, reading comprehension, math calculation skills and math reasoning." (Tr. 300.)

In a letter dated July 27, 2011, Workman's treating physician, Dr. Aric Groshong ("Dr. Groshong"), stated that Workman had been diagnosed in the past with attention deficit disorder ("ADD") and Asperger's Syndrome, had "not been on medication since at least 2006," received "speech therapy at school," and reported "functioning well in the school [and] home settings," although "she continued to exhibit some mild symptoms of ADD." (Tr. 376.) Dr. Groshong added that a seizure disorder "was also [a] past consideration," but testing results suggested that Workman was not "likely [suffering from] seizures." (Tr. 376.) Dr. Groshong also stated that he was not aware of "any further difficulties" related to seizures or any "physical limitations," and that during Workman's last check-up in 2007, she reported that her school work was improving. (Tr. 376.)

On May 7, 2011, Dr. Bill Hennings ("Dr. Hennings"), a non-examining state agency psychologist, completed a mental residual functional capacity assessment based on his review of Workman's medical records. (Tr. 92-94.) Dr. Hennings concluded that Workman was not significantly limited in thirteen categories of mental activity relating to an individual's "understanding and memory limitations," "sustained concentration and persistence limitations,"

and "social interaction limitations." (Tr. 92-93.) Dr. Hennings also found that Workman was moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, and to interact appropriately with the general public. Dr. Hennings added that Workman is capable of understanding and remembering one- to two-step instructions, carrying out and maintaining the concentration and persistence necessary to perform one- to two-step tasks, engaging in appropriate interactions with co-workers and supervisors, and occasionally interacting with the general public.

Also on May 7, 2011, Dr. Hennings completed a psychiatric review technique assessment. (Tr. 90-91.) Dr. Hennings concluded that the limitations imposed by Workman's mental impairments failed to satisfy listings 12.06 (anxiety-related disorders) and 12.10 (autistic disorders).

Between September 2011 and January 2012, Workman was treated for depression at the Douglas County Mental Health Division. (Tr. 396-411.) In a discharge summary report, social worker Stacy Nielsen ("Nielsen") concluded that Workman's Global Assessment of Functioning ("GAF") was sixty-one,[3] and noted that Workman had been diagnosed with mild depression and had a history of ADD and Asperger's Syndrome. Neilsen reported that ongoing therapy was unwarranted because Workman reported that her "symptoms of depression are being managed through exercise, maintaining with her church and developing a ministry mission and attending [Umpqua Community College]." (Tr. 396-97.) In a mental status examination report, William

---

[3] "GAF rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." *Zabala v. Astrue*, 595 F.3d 402, 405 n.1 (2d Cir. 2010). "A GAF in the range of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* (citation, quotation marks, and brackets omitted).

Conley ("Conley"), a licensed therapist, also noted that Workman's behavior, thought content, memory, perception, insight, judgment, and intellectual functioning were all within normal limits. (Tr. 402-04.)

Not long after she began receiving treatment at the Douglas County Mental Health Division, Workman was referred to Dr. Allan Kirkendall ("Dr. Kirkendall") for a psychological evaluation. (Tr. 389-92.) In a psychological evaluation report dated October 4, 2011, Dr. Kirkendall observed that Workman (1) complained primarily of difficulties sustaining attention without the ADD medication she stopped taking in 2006, chronic headaches, her fiancé's "significant emotional and legal troubles," and a speech impediment, which "make[s] it difficult for her to be around people" because she was teased so often in the past, (2) "did not appear to exaggerate difficulties" and was "not seen as malingering," (3) exhibited "some symptoms" of posttraumatic stress disorder, (4) has a "marked speech impediment" and a past diagnosis of Asperger's Syndrome, which was consistent with "some of the odd behaviors" Workman exhibited during the evaluation, (5) appears to have "survived a very chaotic and at times abusive childhood," appears to be able to "understand and remember instructions given to her most of the time," appears to have "some ability to maintain concentration and attention," and appears to be suffering from "some social anxiety," and (6) can "take care of her own activities of daily living with minimal assistance but she's not able to manage her own day-to-day affairs or effectively plan for the future[.]" (Tr. 390-92.)

Based on the foregoing, Dr. Kirkendall's diagnoses were: Axis I—Asperger's Syndrome, generalized social anxiety, and "[r]ule out" posttraumatic stress disorder,[4] Axis II—no diagnoses,

---

[4] The *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* ("DSM-IV") "is the standard classification of mental disorders used by mental health professionals in the United States." *Ortiz-Morales v. Shinseki*, No. 07-3750, 2010 WL 2978436, at *2 n.1 (Vet. App.

Axis III—chronic headaches, Axis IV—the lack of "any primary support group beyond her elderly grandmother," the fact that Workman "may well be involved with an older predatory male," "marked economic problems," "problems accessing healthcare service," and the fact that Workman "is currently living in a shelter for homeless teenagers," and Axis V—a GAF score of fifty.[5]

On March 26, 2012, Dr. Kordell Kennemer ("Dr. Kennemer"), a non-examining state agency psychologist, completed a mental residual functional capacity assessment. (Tr. 117-18.) Dr. Kennemer agreed with Dr. Hennings' findings that Workman is (1) not significantly limited in thirteen categories of mental activity relating to an individual's "understanding and memory limitations," "sustained concentration and persistence limitations," and "social interaction limitations," (2) moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and interact appropriately with the public, and (3) capable of understanding and remembering one- to two-step instructions, carrying out and maintaining the concentration and persistence necessary to perform one- to two-step tasks, engaging in appropriate interactions with co-workers and supervisors, and occasional interaction with the public. (Tr. 117-18.)

---

July 27, 2010). Under the DSM-IV classification system, Axis I concerns clinical disorders, Axis II concerns personality disorders and mental retardation, Axis III concerns general medical conditions, Axis IV concerns psychosocial and environmental factors, and Axis V concerns the GAF scale. *Id.*; *see also Burton v. Comm'r Soc. Sec.*, No. 15-530, 2016 WL 9350081, at *4 n.5 (S.D. Ohio Aug. 25, 2016) (noting that the GAF scale "is no longer used in the current version" of the DSM).

[5] A GAF of forty-one to fifty indicates "serious symptoms or any serious impairment." *Bland v. Astrue*, 432 F. App'x 719, 721 n.1 (10th Cir. 2011) (citation, quotation marks, and brackets omitted).

Also on March 26, 2012, Dr. Kennemer completed a psychiatric review technique assessment, agreeing with Dr. Hennings' finding that Workman does not satisfy listings 12.06 and 12.10. (Tr. 115-16.)

In a letter dated July 8, 2013, Jason Wilkey ("Wilkey"), an employment support specialist at Portland Habilitation Center, Inc., indicated that his company's "mission is to train and employ persons with severe disabilities," that an initial review of Workman's "disability status" had been completed, and that Workman was "being placed on the primary disability wait list for training" because an initial review of her records suggested that she was "unable to engage in normal, competitive employment over an extended period of time." (Tr. 486.) Between July 15, 2013 and August 20, 2013, Workman participated in a janitorial training program through Portland Habilitation Center, Inc., and was paid "by Oregon state minimum wage standards." (Tr. 478-85.) Workman was terminated from the training program for excessive absenteeism. (Tr. 478.)

On July 16, 2014, Workman appeared and testified at a hearing before an Administrative Law Judge ("ALJ").[6] (Tr. 37-75.) Workman testified that she rides the bus as her primary mode of transportation and does "[n]ot usually" have any problems, but has "gotten lost a couple of times even with the directions," she took college level computer classes in 2012, but lost her financial aid because she "failed too many classes," she participates in church activities, she got married in May 2012 and has two young children (at the time, one was nineteen months old and the other was three months old), her husband quit his job in May 2014 because she "was struggling too much" with childcare, and because he discovered that his employer was involved

---

[6] Workman initially appeared to testify at a hearing on March 10, 2014, but her attorney asked the ALJ to postpone the hearing because Workman's child care arrangements fell through and the attorney had "concerns about proceeding when [Workman was] watching the child." (Tr. 79-84.)

in "marijuana activities," and the State of Oregon conducted a parental fitness evaluation and found that her children "were safe in [her] care with [her] husband working [twelve] hours a day[.]" (Tr. 41-47, 55.) Workman also agreed that caring for her two children while her husband worked was equivalent to a "full-time job," but she testified that she does not believe she can sustain full-time employment because she will "be in the middle of doing something" and she "won't know what [she is] doing . . . and [will] basically have to stop until [she] basically can recover," and because she worries about her "seizures," which had recently resulted in a rib injury. (Tr. 49.) Workman further testified that she "had a speech therapist" in high school and participated in an Individualized Educational Program "for kids that needed extra help," she received "a regular high school diploma," she posts on Facebook "once in a while," and she enjoys drawing, going on walks with her husband, playing on the computer, and writing down prayers. (Tr. 51-56.)

The ALJ posed hypothetical questions to a Vocational Expert ("VE") who testified at Workman's hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Workman's age, education, and work experience could perform work "at all exertional levels" that involve understanding, remembering, and carrying out "unskilled, routine, and repetitive work," "no more than occasional contact with supervisors," and working "in proximity to co-workers," but does not involve "a requirement for talking," providing "direct service to the general public," or working in "a team or cooperative effort" with co-workers. (Tr. 68-69.) The VE stated that the hypothetical worker could be employed as a laundry laborer, fish cleaner, and garment folder.

Responding to the ALJ's second hypothetical, the VE confirmed that the hypothetical worker could be employed in the jobs above, even if she could not be exposed to unprotected

heights or hazards. Responding to the ALJ's follow-up questions, the VE testified that employers usually "tolerate somewhere between six and ten absences per year" (i.e., "less than one per month"), and an employee would be fired for being off task more than fifteen percent of the day. (Tr. 70.)

Workman's attorney also posed questions to the VE who testified at Workman's hearing. In response to those questions, the VE confirmed that he would be cautious about placing an individual who suffers from seizures in the fish cleaner position because it involves working with sharp tools. The VE also testified that the hypothetical worker (1) would still need to communicate verbally with her supervisors at times, even if the job in question did not include a talking requirement, (2) would be terminated if she needed additional breaks outside of the three provided, was ten minutes late to work "week after week," performed at a pace that was ten percent slower than expected and failed to remedy the problem, or "was only able to sustain activities at a pace that was [fifteen percent] off task," and (3) "might" be terminated if she "could not manage social interactions" or "lacked the ability to respond appropriately to supervision" fifteen percent of the time, although it "would depend on the behavior and other factors." (Tr. 70-73.)

On August 6, 2014, Workman's attorney referred her to Dr. Scott Alvord ("Dr. Alvord") for a psychological evaluation. (Tr. 516-23.) As part of his evaluation, Dr. Alvord interviewed Workman and her husband, reviewed "limited historical records," and administered, *inter alia*, the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"). (Tr. 522.) On WAIS-IV, Workman obtained a full-scale IQ score of seventy-seven, a verbal comprehension score of seventy-nine, a perceptual reasoning score of seventy-eight, a working memory score of seventy-seven, and a processing speed score of seventy-seven. Workman's scores on the WAIS-IV, when

compared with Workman's "significantly higher" scores on the WISC-IV administered in 2008, led Dr. Alvord to (1) "suspect" there had been a "dramatic" decline in Workman's "overall intelligence, as well as memory," thus "highlighting the probability of [a] cognitive disorder presumably associated with a history of seizures," and (2) conclude that "it is likely [Workman] also has historically met the diagnostic criteria for a learning disorder [not otherwise specified]." (Tr. 517, 523.)

In his evaluation report, Dr. Alvord also noted that (1) Workman "was not judged to be an overly reliable historian," (2) Workman's memory impairment is "secondary to a cognitive disorder related to a premorbid developmental disorder exacerbated by history of a seizure disorder," (3) Workman had what Dr. Alvord perceived to be two absence seizures during their encounter,[7] (4) Workman "asked to use the bathroom to get a drink of water" three times during the evaluation and "[o]n all three occasions she was unable to find her way back to [Dr. Alvord's] office despite the fact that the bathroom was across the hall and one door down," and on one occasion Dr. Alvord was "forced to find her waiting in the waiting room," (5) "[i]t is unclear why [Workman] is not being treated with seizure medications," (6) Workman complained of anxiety, depression, abuse by her grandmother, and of being robbed of $2,000, (7) Workman "presented as flushed and perspiring with a quavering voice and psychomotor hyperactivity/physically manifested anxiety," (8) Workman attends to her activities of daily living "independently, but her husband said that he often has to remind her to shower or change

---

[7] "An absence seizure is 'the seizure seen in absence epilepsy, consisting of a sudden momentary break in consciousness of thought or activity, often accompanied by automatisms or clonic movements, especially of the eyelids.'" *Ames v. Sec'y Health & Human Servs.*, No. 04-1706, 2005 WL 6120733, at *2 n.12 (Fed. Cl. Oct. 18, 2005) (citation omitted); *see also N.H. ex rel. Eure v. Colvin*, No. 2:12–cv–70, 2013 WL 6410378, at *1 (E.D.N.C. Dec. 9, 2013) ("An absence seizure is characterized by impaired awareness and involves a brief and sudden lapse in consciousness.").

clothing," (9) "[v]alidity issues were not suspected" and Workman's test results "are judged to slightly underrepresent her neurocognitive functioning secondary to anxiety/minimal lack of continuity due to seizure symptoms and head pain," and (10) anxiety "likely impacted [Workman's] performance on testing" during the evaluation, which "could be extrapolated to suggest that her performance in any stressful situation will be significantly impacted." (Tr. 517-23.)

Based on the foregoing, Dr. Alvord's diagnoses were posttraumatic stress disorder, pervasive developmental disorder not otherwise specified, rule out a learning disorder not otherwise specified, cognitive disorder not otherwise specified (Axis I), borderline intellectual functioning (Axis II), seizure disorder "deferred to medical" (Axis III), psychosocial stressors (e.g., limited social interactions, financial strain, occupation limitations, history of assault, history of childhood abuse) (Axis IV), and a GAF score of forty to forty-five (Axis IV).[8] (Tr. 523.)

Also on August 6, 2014, Dr. Alvord filled out a Mental Residual Functional Capacity Assessment at the request of Workman's counsel. (Tr. 525-28.) In the assessment, Dr. Alvord opined that Workman suffers from a "Category IV" level of impairment (i.e., precludes performance for fifteen percent or more of a seven-and-a-half hour workday) in her ability to remember locations and work-like procedures, understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within

---

[8] "A GAF of forty indicates some impairment in reality testing or communication, or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 n.3 (9th Cir. 2005) (citation omitted). A GAF of forty-one to fifty indicates serious symptoms or a serious impairment. *Bland*, 432 F. App'x at 721 n.1.

customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals and make plans independently. Dr. Alvord also opined "to a reasonable degree of medical certainty" that Workman will be "unable to perform independently, appropriately, effectively and on a sustained basis" sixty-five percent of the time. (Tr. 528.)

On October 21, 2014, Workman visited Dr. Andrew Rose-Innes ("Dr. Rose-Innes"), a neurologist, regarding her "seizure-like episodes." (Tr. 546.) Workman described these episodes as "'spacing out,' where she will not recall what she was doing immediately before," and her husband recalled instances of Workman "leaving the stove on and walking off while preparing food; walking into traffic, shaking episodes." (Tr. 546.) Dr. Rose-Innes noted that Workman's husband had "never seen a convulsion" over the course of three years, Workman's "history was only moderately reliable," Workman would intermittently "gaze off to one side or the other as if she was daydreaming," which "potentially might represent absence seizures, but [is] not characteristic," and the remainder of the "neurological examination was within normal limits." (Tr. 546-48.)

On October 30, 2014, Workman underwent a magnetic resonance imaging ("MRI") of her brain after complaining of "seizure-like episodes." (Tr. 540, 546.) Workman's brain MRI

produced a "[n]ormal study" and "[n]o etiology for [a] seizure disorder [was] identified." (Tr. 540.) Shortly before this time, Workman visited her then-primary care physician, Dr. Joseph Resendiz ("Dr. Resendiz"), and "want[ed] to discuss" treating her seizures with medical cannabis. (Tr. 546, 563.) Dr. Resendiz signed Workman's medical marijuana application the next week. (Tr. 562.)

In a written decision issued on November 14, 2014, the ALJ applied the five-step process set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), and found that Workman was not disabled. *See infra*. The Social Security Administration Appeals Council denied Workman's petition for review, making the ALJ's decision the Commissioner's final decision. Workman timely appealed.

## THE FIVE-STEP SEQUENTIAL ANALYSIS

## I. LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Workman is disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. At step one, the ALJ determined that Workman had not been engaged in substantial gainful activity since September 17, 1992, the alleged disability onset date. (Tr. 21.) At step two, the ALJ found that Workman had three severe impairments: (1) Asperger's Syndrome; (2) affective disorder; and (3) anxiety disorder. (Tr. 21.) At step three, the ALJ found that Workman did not have an impairment that meets or equals a listed impairment. (Tr. 22.) The ALJ then determined that Workman had the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels," subject to the following restrictions: (1) there cannot be "a requirement for talking," (2) the jobs cannot involve working at unprotected heights or exposure to hazards, (3) the jobs must be consistent with an ability to "understand, remember, and carry out unskilled, routine, and repetitive work . . . that requires no more than occasional contact with supervisors," (4) the jobs can involve working "in proximity to co-workers but not in a team or cooperative environment," and (5) the jobs cannot

involve "work in which direct service to the general public" is required. (Tr. 23.) At step four, the ALJ concluded that Workman has no past relevant work. (Tr. 27.) At step five, the ALJ concluded that Workman is not disabled because there are jobs that exist in significant numbers in the economy that she can perform, including work as a laundry laborer and garment folder. (Tr. 28.)

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

In this appeal, Workman argues that the ALJ erred by: (1) failing to provide clear and convincing reasons for rejecting her symptom testimony; (2) failing to provide specific and

legitimate reasons for discounting the opinions of her examining psychologists, Drs. Alvord and Kirkendall; and (3) failing to provide germane reasons for discounting the lay witness testimony provided by Workman's grandmother, Nancy Peete ("Peete"). (Pl.'s Opening Br. at 1-2, 4.) As explained below, the Court concludes that the Commissioner's decision is free of harmful legal error and supported by substantial evidence. Accordingly, the Court affirms the Commissioner's decision.

## I.    CREDIBILITY DETERMINATION

### A.    Applicable Law

Absent an express finding of malingering, an ALJ must provide clear and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's [subjective] complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted). Clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly

contrary to 42 U.S.C. § 423(d)(5)(A).'" (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

**B.      Application of Law to Fact**

There is no affirmative evidence that Workman is malingering and, therefore, the ALJ was required to provide clear and convincing reasons for discrediting Workman's testimony. Upon review, the Court concludes that the ALJ satisfied the clear and convincing reasons standard.

First, the ALJ discounted Workman's symptom testimony because it is inconsistent with her daily activities. (*See* Tr. 24-25, discounting Workman's symptom testimony, and noting that "until [two] months prior to the hearing, the claimant was the sole caregiver for two small children while her husband worked [twelve]-hour days," and that Workman reported that the State of Oregon "determined that the children were safe in her care while her husband was working long hours," Tr. 27, noting that Workman's "activities as reported in the record" support the ALJ's RFC determination). "Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Martin v. Colvin*, No. 3:14–cv–01603–SB, 2016 WL 890106, at *8 (D. Or. Feb. 9, 2016) (citation omitted).

Substantial evidence supports the ALJ's finding that Workman engaged in daily activities that are incompatible with her symptom testimony. (*Compare* Tr. 49-51, citing moments of forgetfulness or apparent absence seizures, along with potential seizure-related falls, as Workman's primary barriers to employment, Tr. 391, appearing for an evaluation and complaining of "anxiety, especially social anxiety as a long-standing problem," Tr. 519-20, emphasizing anxiety attacks during an evaluation, reporting that such attacks occur "a couple of times a week" and are triggered "by social settings including grocery stores," reporting signs of

depression, such as a lack of energy and motivation, and describing social "isolation with the exception of her husband and children," *with* Tr. 46-49, testifying that Workman's past childcare activities equated to full-time work, and she was able to feed, clothe, and change her children while her husband worked, Tr. 310-17, testifying that Workman is able to go outside "[a]bout everyday walking around town with [a] group doing things," shop in stores for food, hygiene products, clothes, etc., "[w]hen [she] needs to and until [she is] done," engage in social activities on a daily basis, including spending "[a] lot of time with others in person" and interacting on the computer, prepare meals, including "complete meals with several courses" within the "normal time," perform household chores "about every day and [within the] normal amount of time," count change, handle a savings account, read, play the flute, and participate in church activities, Tr. 318-25, indicating that Workman "loves to shop" in stores and online, is "very independent" and gets around "as desired," reads "very often" and "very well," and "loves to be around people," Tr. 391, reporting that Workman's "typical day" consists of helping her then-fiancé with his homework before he "leaves for [his] college" classes, running "errands around town" multiple times, walking "everywhere," eating, visiting with people, watching television, listening to music, and using the computer, Tr. 396-98, noting that Workman reported that she is "very active with working out" and fundraising for her church, she is "a person who can do things on [her] own, but sometimes [may] need a little help," she is able to manage her depression with exercise, school, and church, and "there seems to be no further need for mental health treatment").

Workman argues that the ALJ erred in concluding that her daily activities were incompatible with her symptom testimony. In support of her argument, Workman notes that she testified that "her husband had to quit his job after just two to three months because she was

unable to provide adequate care to their children without help," and claims that "her testimony evidences essentially an unsuccessful work attempt." (Pl.'s Opening Br. at 15.) The Court is not persuaded by this argument. Although Workman claims that her husband quit his job because she was unable to provide adequate care for their children, she also testified that (1) the State of Oregon conducted a parental fitness evaluation while her husband was working and determined that she was fit and able to care for their children, (2) her husband left his job due, in part, to the fact that his employer was engaged in illegal activities, (3) she was able to feed, clothe, and change her children while her husband was working, although it was "hard" and she would at times need to "basically wait for [a] moment [where she was] unable to think to pass," and (4) she engaged in a number of other activities (described and cited above) that are incompatible with her testimony. (Tr. 44-59.) Accordingly, it was appropriate for the ALJ to conclude that Workman's activities are incompatible with the severity of symptoms alleged.[9] *See Smith v. Comm'r Soc. Sec. Admin.*, 611 F. App'x 897, 900 (9th Cir. 2015) (affirming the ALJ's adverse credibility determination, and noting that the ALJ found the claimant's testimony was contradicted by, *inter alia*, "her own description of helping with" the "care of children" and household chores); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (affirming the ALJ's adverse credibility determination, and noting that the claimant's claim of disability was undermined by testimony about her daily activities, such as "attending to the needs of her two

---

[9] Workman's reliance on *Trevizo v. Berryhill*, ---- F.3d ---- , 2017 WL 4053751, at *8 (9th Cir. Sept. 14, 2017), is unavailing. In *Trevizo*, the record provided "no details as to what [the claimant's] regular childcare activities involved," and thus the Ninth Circuit held that the ALJ improperly relied on those activities in discounting a treating doctor's opinion. *Id.* In this case, the record provides details as to what Workman's childcare activities involved. (*See* Tr. 44-47, testifying that Workman was the only individual who cared for her two children while her husband was working twelve hours per day, that Workman feeds, clothes, and changes the children, and that the State of Oregon determined that Workman was fit and able to care for the children).

young children," cooking, and shopping); *see also Molina*, 674 F.3d at 1113 ("Even where [a claimant's daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.").

Second, the ALJ discounted Workman's testimony based on a lack of corroborating medical evidence. *See Nikitchuk v. Astrue*, 240 F. App'x 740, 742 (9th Cir. 2007) (explaining that it is appropriate for an ALJ to consider a "lack of medical evidence corroborating" a claimant's "testimony as one factor in [a] credibility determination"). For example, the ALJ noted that "[t]he medical evidence is inconsistent with the claimant's allegations of disability." (Tr. 24.) In support of this assertion, the ALJ noted that Workman, who alleges disability based primarily on mental impairments, had "benign mental status examinations," obtained "a full-scale IQ of 102," and "was described [on examination] as needing some re-direction but able to sustain attention when needed." (Tr. 24.) The ALJ also cited the lack of corroborating evidence to support Workman's claim of a disabling seizure disorder.[10] (*See* Tr. 22, finding a seizure disorder to be non-severe, and noting that a neurology department felt that Workman's issues "were likely not [related] to seizures," "no etiology for a seizure disorder [was] revealed" following a brain MRI, and Dr. Rose-Innes "did not embrace a diagnosis of a seizure disorder" and suggested that Workman's behavior was not "characteristic of absence seizures").

---

[10] The ALJ's adverse credibility determination did not explicitly rely on the lack of corroborating evidence regarding Workman's alleged seizure disorder, but the ALJ did make such findings at step two of the sequential process (which is not challenged on appeal), and it is appropriate for the Court to consider additional support for a ground on which the ALJ relied. *See Fenton v. Colvin*, No. 6:14-00350-SI, 2015 WL 3464072, at *1 (D. Or. June 1, 2015) ("The Court is not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but the Court is permitted to consider additional support for a ground on which the ALJ relied.").

Substantial evidence supports the ALJ's findings. (*Compare* Tr. 49-51, citing seizure-related issues as Workman's primary barriers to employment, Tr. 517, 523, "defer[ing] to medical" with respect to Workman's alleged seizure disorder, but nevertheless hypothesizing that Workman's markedly lower test scores "suggest[ed] that her intellectual functioning had declined dramatically, highlighting the probability of [a] cognitive disorder presumably associated with a history of seizures," Tr. 546, reporting that Workman's seizures cause her to forget "what she has been doing immediately before," *with* Tr. 299, indicating that Workman obtained a full-scale IQ score of 102, Tr. 326, indicating that Workman can "talk, respond appropriately, [and] remember what happens during a seizure," Tr. 372, reporting that "in the scheme of [Workman's] disabilities as a whole, her seizures were the least of all of the problems she spent her life struggling with," Tr. 376-77, noting that there was "some past consideration of a seizure disorder" that was "followed by neurology," that an electroencephalogram "showed some independent spike foci in the right central and left temporal regions," that Workman's neurologist "was not convinced that [she] had seizures" and felt that her issues were "more likely related to her behavioral issues," and that Workman's grandfather reported that she did not have "any concerns of seizures" after being tapered off "anticonvulsant[]" seizure medication, Tr. 390-91, noting that a mental status examination revealed "average intelligence," "some ability to think[] abstractly," and "generally intact" short-term memory and immediate recall, and an ability to provide "reasonable answers to [two] hypothetical social problems," "complete serial 3s and spell the word 'WORLD' both forwards and backwards," "maintain attention and/or concentration for at least short periods of time," and remember a list of three unrelated words after a five-minute delay, Tr. 402-04, noting that Workman's behavior, thought content, memory, perception, insight, judgment, and intellectual functioning were within normal limits on a mental

status examination, Tr. 546-48, noting that Workman's husband "has never seen a convulsion" during their three-year relationship, Workman's presentation was "not characteristic" of absence seizures, and the remainder of her "neurological examination was within normal limits," Tr. 540, noting that a brain MRI produced a "[n]ormal study" and "[n]o etiology for [a] seizure disorder [was] identified").

Based on the foregoing, the Court declines to second-guess the ALJ's credibility determination because it is reasonable and supported by substantial evidence in the record. *See Rollins*, 261 F.3d at 856 ("[T]he ALJ's interpretation of [the claimant's] testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it."); *see also Dowell v. Berryhill*, No. 16-614-SI, 2017 WL 1217158, at *5 (D. Or. Apr. 3, 2017) (noting that the court may uphold an ALJ's credibility determination even if some of the reasons the ALJ provided were not legally sufficient).

## II.  MEDICAL OPINION EVIDENCE

### A.  Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

### B.       Application of Law to Fact

Workman argues that the ALJ failed to provide specific and legitimate reasons for discounting the opinions of her examining psychologists, Drs. Alvord and Kirkendall. (*See* Pl.'s Reply at 2, acknowledging that the specific and legitimate reasons standard applies). The Court disagrees.

#### 1.       Dr. Alvord

First, the ALJ discounted Dr. Alvord's opinion evidence on the ground that it was inconsistent with Workman's reported activities. (*See* Tr. 26, assigning "little weight" to Dr. Alvord's opinion evidence, and noting that it was "inconsistent with the claimant's reported activities"). A conflict between a doctor's opinion and a claimant's activities is a specific and legitimate reason for discounting the doctor's opinion. *Gontes v. Astrue*, 913 F. Supp. 2d 913, 924 (C.D. Cal. 2012). It was reasonable for the ALJ to conclude that Dr. Alvord's opinion conflicted with Workman's activities. Dr. Alvord opined that Workman is significantly impaired in her ability to, among other things: (1) use public transportation, (2) be aware of normal

hazards and take appropriate precautions, sustain an ordinary routine without special supervision, and maintain attention and concentration for the "approximately two hours between starting work and the first break," (3) adhere to basic standards of neatness and cleanliness, (4) set realistic goals and make plans independently of others, (5) interact appropriately with the general public, and (6) ask simple questions or request assistance. (Tr. 526-27.) The record, however, reveals that Workman (1) at times needs directions, but does "[n]ot usually" have "any problem taking the bus," rode the bus when she attended Umpqua Community College, and reported that "she does not have a car and must rely on public transportation or walking" (Tr. 41, 56, 411), (2) was able to care for her children by herself and keep them "safe" while her husband was working twelve-hour days, which was confirmed by a parental fitness evaluation, and "knew to call 911 in an emergency" (Tr. 44-47, 391), (3) "showers every day" and "never needs reminded," "brushes her teeth twice a day," and presented as "neatly and casually dressed" and within normal limits (i.e., not "[d]isheveled") during medical evaluations (Tr. 390-91, 402), (4) made "plans to obtain a student loan and attend classes" at Umpqua Community College and "get an apartment with [her student loan] funds," and worked "hard to complete all the necessary paperwork to become enrolled in college and line up financial aid" (Tr. 390, 407), (5) "gets along with most everyone," is able to shop in stores "[w]hen [she] need[s] to and until [she is] done," and spends "[a]bout every day walking around town with [a] group doing things" (Tr. 313-14, 322), and (6) seeks childcare advice from a pediatric nurse and her grandmother and aunt. (Tr. 58.)

Dr. Alvord also opined that Workman suffers from social anxiety, and that her anxiety impacts her performance on tests and ability to maintain concentration and focus. (*See* Tr. 517-23, noting that Workman emphasized anxiety attacks during Dr. Alvord's evaluation, reported

that such attacks occur "a couple of times a week" and are triggered "by social settings including grocery stores," and described social "isolation with the exception of her husband and children," and opining that Workman's anxiety impacts her performance on tests and ability to concentrate and focus). As the ALJ observed, Dr. Alvord's opinions are inconsistent with Workman's activities. (*See* Tr. 310-17, testifying that Workman is able to go outside "[a]bout everyday walking around town with [a] group doing things," shop in stores for a variety of products "[w]hen [she] needs to and until [she is] done," and engage in social activities on a daily basis, including spending "[a] lot of time with others in person," Tr. 318-25, indicating that Workman "loves to shop" in stores, is "very independent," and gets around "as desired," Tr. 391, reporting that Workman's "typical day" consists of, *inter alia*, running "errands around town" multiple times, Tr. 396-98, reporting that Workman "had been very active with working out" and church fundraising).

Second, the ALJ discounted Dr. Alvord's opinion because it conflicted with objective medical evidence. *See Taddeo v. Colvin*, No. 13-541, 2014 WL 4961151, at *5 (D. Nev. Oct. 3, 2014) ("The ALJ's assignment of little weight to Dr. Plon is supported by specific and legitimate reasons based on the conflict with other objective medical evidence and opinion evidence in the record."). For example, the ALJ stated: "Dr. Alvord hypothesized that [Workman's] seizure disorder may have contributed to her stark decline [on testing], [but] the fact that a neurological consultation in November 2014 revealed no clear signs of any seizure disorder undermines this hypothesis[.]" (Tr. 25.) The ALJ therefore assigned "little weight" to Dr. Alvord's opinion because it was "inconsistent with subsequent neurological consultations that showed no seizure disorder." (Tr. 26.) Substantial evidence supports the ALJ's finding that Dr. Alvord's opinion rested on an assumption that conflicted with objective medical evidence. (*Compare* Tr. 517, 523,

"defer[ing] to medical" regarding a seizure disorder, but nevertheless hypothesizing that Workman's lower test scores "suggest[ed] that her intellectual functioning had declined dramatically, highlighting the probability of [a] cognitive disorder presumably associated with a history of seizures," *with* Tr. 376-77, noting that there was "some past consideration of a seizure disorder" that was "followed by neurology," that an electroencephalogram "showed some independent spike foci in the right central and left temporal regions," and that Workman's neurologist "was not convinced that [she] had seizures" and felt her issues were "more likely related to her behavioral issues," Tr. 540, noting that a brain MRI produced a "[n]ormal study" and "[n]o etiology for [a] seizure disorder [was] identified," Tr. 546-48, noting that Workman's presentation was "not characteristic" of absence seizures, and the remainder of her "neurological examination was within normal limits").

Workman challenges the ALJ's above finding, noting that "Dr. Alvord in fact opined that [her] performance was significantly impacted by anxiety, which he observed to be physically manifested during testing." (Pl.'s Opening Br. at 10.) It is true that, when Workman was being evaluated by Dr. Alvord, "she presented as flushed and perspiring with a quavering voice and psychomotor hyperactivity/physically manifested by anxiety." (Tr. 519.) It is also true, however, that Dr. Alvord opined that Workman's "seizures and underlying anxiety/panic are interrelated," and that Workman's anxiousness is "exacerbated by fears of having seizures in public." (Tr. 519.) Given the fact that Workman's alleged seizure disorder and anxiety are "interrelated," and the fact that Dr. Alvord deferred to the medical evidence regarding a seizure disorder, the ALJ appropriately discounted Dr. Alvord's opinion because it conflicted with objective medical evidence.

Third, the ALJ rejected Dr. Alvord's opinion evidence in favor of the state agency medical consultants' conflicting opinions. (*See* Tr. 26, assigning "significant weight" to the state agency medical consultants' conflicting opinions because they were "consistent with the record," and then assigning "little weight" to Dr. Alvord's opinion because it is inconsistent with record evidence). The state agency doctors' conflicting opinions regarding Workman's functional limitations, coupled with the other reasons described above, constitutes substantial evidence necessary to affirm the ALJ's rejection of Dr. Alvord's opinion evidence. *See, e.g., Morford v. Colvin*, No. 6:15–cv–01216–SB, 2016 WL 3092109, at *8 (D. Or. June 1, 2016) (stating that a non-examining doctor's opinion, coupled with other reasons provided by the ALJ, constituted "the substantial evidence necessary to affirm the ALJ's rejection" of another doctor's opinion evidence).

For these reasons, the Court finds that the ALJ's rejection of Dr. Alvord's opinion evidence was supported by substantial evidence and, therefore, should not be disturbed on appeal.[11]

///

---

[11] When Dr. Kirkendall examined Workman, she was "able to complete serials 3s." (Tr. 390.) Serial 3s assess an individual's ability to maintain concentration and attention by having them count "backwards from 100 to 50 by 3s." *Hudson v. Colvin*, No. 12-00044, 2013 WL 1500199, at *10 (N.D.N.Y. Mar. 21, 2013). When Dr. Alvord later examined Workman, she "refused" to complete "serial 3's stating 'I can't do that.'" (Tr. 521; *see also* Tr. 450, describing Workman's test results, and noting that she can "add, subtract, multiply and divide with regrouping, add, subtract, and multiply with fractions (and reduce to lowest terms), solve algebraic equations, follow order of operations, and calculate with decimals and negative numbers"). Such a discrepancy lends support to the ALJ's observation that Workman's performance during Dr. Alvord's psychological evaluation "was lacking for other reasons." (Tr. 25; *see also* Tr. 390, "When asked [by Dr. Kirkendall] what the saying means 'you can't judge a book by its cover' she stated people assume things and shouldn't," *cf.* Tr. 521, "[W]hen [later] asked [by Dr. Alvord] regarding [the saying] Don't Judge a Book By It[s] Cover, she initially stated 'can you repeat the question.' After it was repeated, she stated 'don't judge a book by it[s] cover.'").

### 2. Dr. Kirkendall

The ALJ also gave "specific and legitimate reasons supported by substantial evidence in the evidence in record," *Reddick*, 157 F.3d at 725, for assigning little weight to Dr. Kirkendall's opinion. First, the ALJ discounted Dr. Kirkendall's opinion on the ground that it was inconsistent with Workman's activities. (*See* Tr. 26, stating that Dr. Kirkendall's opinion is "not consistent with the claimant's demonstrated ability to care for her two young children while her husband worked [twelve]-hour days"). A conflict between a doctor's opinion and a claimant's activities is a specific and legitimate reason for discounting the doctor's opinion. *Gontes*, 913 F. Supp. 2d at 924. Substantial evidence supports the ALJ's finding. (*Compare* Tr. 392, opining that Workman "appears to be suffering from some social anxiety and this combined with her Asperger's syndrome makes normal social interactions difficult for her," and that Workman is "not able to manage her own day-to-day affairs or effectively plan for [the] future because of her Asperger's Syndrome," *with* Tr. 44-47, testifying that Workman was the only individual who cared for her two young children while her husband was working twelve hours per day, that Workman feeds, clothes, and changes the children, and that the State of Oregon conducted a parental fitness evaluation and determined that Workman was fit and able to care for her children, Tr. 310-25, indicating that Workman "gets along with most everyone," is able to shop in stores "[w]hen [she] need[s] to and until [she is] done," spends "[a]bout every day walking around town with [a] group doing things," engages in social activities on a daily basis, including spending "[a] lot of time with others in person," "loves to shop" in stores, is "very independent," and gets around "as desired," Tr. 390-91, 396-98, 407, reporting that Workman's "typical day" consists of, *inter alia*, running "errands around town" multiple times, that Workman has "been very active with working out" and fundraising, and that Workman was able to make "plans to obtain a student loan and attend classes" at Umpqua Community College and "get an apartment with [her loan]

funds," and worked "hard to complete all the necessary paperwork to become enrolled in college and line up financial aid").

Second, the ALJ discounted Dr. Kirkendall's opinion on the ground that it was "inconsistent with the treatment record," noting that Workman "rapid[ly] progress[ed] through treatment" at the Douglas County Mental Health Division. (Tr. 26.) An ALJ may discount a doctor's opinion when it is "inconsistent with other evidence in the record." *Burdon v. Colvin*, 650 F. App'x 535, 537 (9th Cir. 2016) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). Workman argues that the ALJ erred in doing so here because she was only being treated for depression at the Douglas County Mental Health Division and Dr. Kirkendall did not diagnose a depressive disorder. The record indicates that during Dr. Kirkendall's evaluation, Workman endorsed past struggles with depression and Dr. Kirkendall opined that "community mental health . . . services would be beneficial" to Workman. (Tr. 391-92.) The record also indicates that Workman reported that ongoing mental health treatment "would [not] be much of a use for her" because she was able to manage her depression through exercise, church activities, and attending school, which prompted Nielsen to assign a GAF of sixty-one, agree that Workman "does not appear to need services," state that "there seems to be no further need for mental health treatment," and state that Workman "may need guidance in the future, [but] not necessarily [m]ental [h]ealth therapy or treatment," even though she was aware of Workman's other life stressors and history of Asperger's Syndrome, ADD, and migraines. (Tr. 396-97.) In light of the foregoing, it was appropriate to discount Dr. Kirkendall's opinion on the ground that it was inconsistent with Workman's treatment performance.[12]

---

[12] Workman correctly observes that one of the state agency medical consultants found that Dr. Kirkendall's opinion "is consistent with the medical evidence." (Tr. 116.) That fact is of little import because the ALJ is the fact-finder in disability proceedings, and substantial evidence

Third, the ALJ rejected Dr. Kirkendall's opinion in favor of the state agency medical consultants' less restrictive opinions. (*See* Tr. 26, assigning "significant weight" to the state agency medical consultants' conflicting opinions because they were "consistent with the record," and then assigning "little weight" to Dr. Kirkendall's opinion because it is inconsistent with the record). The state agency doctors' less restrictive opinions, coupled with the other reasons described above, constitutes substantial evidence necessary to affirm the ALJ's rejection of Dr. Kirkendall's opinion evidence. *See Morford*, 2016 WL 3092109, at *8 (stating that a non-examining doctor's opinion, coupled with other reasons provided by the ALJ, constituted "the substantial evidence necessary to affirm the ALJ's rejection" of another doctor's opinion evidence).

In sum, the ALJ provided specific and legitimate reasons for rejecting Dr. Kirkendall's opinion and those reasons are supported by substantial evidence in the record.

## III.    LAY WITNESS TESTIMONY

### A.    Applicable Law

An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). The ALJ cannot disregard such testimony without providing specific reasons that are germane to each witness. *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one such reason." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). "Germane reasons for rejecting a lay witness' testimony [also] include inconsistencies between that testimony and the claimant's presentation to treating physicians or the claimant's activities, and the claimant's

---

supports the findings the ALJ made here. *See Latta v. Astrue*, 482 F. App'x 261, 262-63 (9th Cir. 2012) ("As the fact-finder in disability hearings, the ALJ is responsible for resolving any conflicts in the medical evidence on record." (citing *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002)).

failure to participate in prescribed treatment." *Barber v. Astrue*, No. 10–1432, 2012 WL 458076, at \*21 (E.D. Cal. Feb. 10, 2012). "[W]hen an ALJ provides clear and convincing reasons for rejecting the credibility of a claimant's own subjective complaints, and the lay-witness testimony is similar to the claimant's complaints, it [also] follows that the ALJ gives 'germane reasons for rejecting' the lay testimony." *Williams v. Astrue*, 493 F. App'x 866, 869 (9th Cir. 2012) (citation omitted).

### B.     Application of Law to Fact

Workman argues that the ALJ failed to provide germane reasons for rejecting Peete's lay witness testimony. (Pl.'s Opening Br. at 15-17.) The Commissioner argues that, even assuming the ALJ erred in discounting Peete's testimony, any error was harmless because Peete's testimony "mirrors" Workman's, which the ALJ provided clear and convincing reasons to reject. (Def.'s Br. at 15.) Workman argues that her testimony does not "mirror[]" Peete's, noting only that she reported being "'pretty good' at getting along with authority figures," while Peete reported that she "would have difficulty responding appropriately to supervision." (Pl.'s Reply Br. at 8.)

The question here is whether Peete's testimony is "similar" to Workman's complaints. *Williams*, 493 F. App'x at 869. The Court concludes that it is. (*Compare* Tr. 318-25, reporting that Workman's daily activities consist of doing dishes and laundry, taking care of her own personal hygiene, reading, and interacting with others on the computer, that Workman "loves to shop" and "loves to be around people," that Workman is able to prepare meals, get around "as desired," count change, handle a saving account, read "very well" and often, "get[] along with most everyone," and participate in church activities, and that Workman's ability to pay attention "[d]epends on her interest in" the subject matter, *with* Tr. 310-17, 391, reporting that Workman has little to no difficulty tending to her personal hygiene, and is able to prepare meals, clean, do

the laundry and dishes "about every day," get around "[a]bout every day walking around town with [a] group doing things," shop in stores, count change, handle a savings account, read, participate in church activities, and spend "[a] lot of time with others in person"). The ALJ provided clear and convincing reasons for rejecting Workman's testimony, Peete's testimony was similar to Workman's testimony, and it therefore follows that the ALJ had germane reasons to discount Peete's testimony. Accordingly, the ALJ did not commit harmful error. *See Hart v. Astrue*, 349 F. App'x 175, 177 (9th Cir. 2009) (observing that "the ALJ provided no reasons at all for giving either witness's testimony less than full weight," but nevertheless holding that the error was harmless because "the ALJ still had substantial evidence to support his finding that [the claimant's] impairments were not severe"); *Perkins v. Berryhill,* No. 16-6089, 2017 WL 1380408, at *4 (C.D. Cal. Apr. 17, 2017) (explaining that an ALJ's decision can be affirmed under the harmless error standard "even if the ALJ did not 'clearly link' rejection of the specific lay testimony to the reasons expressed for rejecting the claimant's similar testimony") (citation omitted).

## CONCLUSION

For the reasons stated, the Court AFFIRMS the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

IT IS SO ORDERED.

DATED this 23rd day of October, 2017.

STACIE F. BECKERMAN
United States Magistrate Judge